[Cite as *In re M.M.*, 2018-Ohio-1110.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## ALLEN COUNTY

IN RE:

CASE NO. 1-17-56

M.M.

**O P I N I O N**

Appeal from Allen County Common Pleas Court
Juvenile Division
Trial Court No. 2012-JG-29515

Judgment Affirmed

Date of Decision: March 26, 2018

APPEARANCES:

*Joseph A. Benavidez* for Appellant

*Kyle B. Thines* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, M.M., appeals the November 13, 2017 judgment entry of the Allen County Court of Common Pleas, Juvenile Division, lifting the stay of the adult portion of his serious-youthful-offender-dispositional sentence. For the reasons that follow, we affirm.

{¶2} On March 14, 2012, the Allen County Grand Jury indicted M.M. on four counts, including: Count One of aggravated burglary in violation of R.C. 2911.11(A)(1), a first-degree felony if committed by an adult, Count Two of abduction in violation of R.C. 2905.02(A)(1), a third-degree felony if committed by an adult, Count Three of rape in violation of R.C. 2907.02(A)(2), a first-degree felony if committed by an adult, and Count Four of aggravated robbery in violation of R.C. 2911.01(A)(3), a first-degree felony if committed by an adult. (Doc. No. 1). Each count alleged that M.M., being 13 years old at the time of the offenses, was subject to a serious-youthful-offender designation. (*Id.*).

{¶3} On March 23, 2012, M.M. appeared for arraignment and denied the charges. (Doc. No. 18).

{¶4} On October 24, 2012, M.M. withdrew his denials, admitted the charges, and pleaded delinquent, under a written plea agreement, to Counts Three and Four. (Doc. No. 57). In exchange for his change of pleas, the State agreed to dismiss Counts One and Two. (Doc. No. 59). The trial court accepted M.M.'s delinquency pleas, found him to be a delinquent child by reason of his admission to Counts Three

and Four, dismissed Counts One and Two, and ordered a pre-dispositional report. (*Id.*).

{¶5} After a hearing on November 13, 2012, the trial court found M.M. to be a serious youthful offender and imposed a blended sentence. (Doc. No. 67). The trial court committed M.M. to the legal care and custody of the Ohio Department of Youth Services ("DYS") for a minimum period of three years of commitment as to Count Three and a minimum period of three years of commitment as to Count Four and ordered that M.M. serve the terms consecutively for an aggregate minimum period of commitment of six years not to exceed M.M.'s 21st birthday. (*Id.*). As for the adult sentence, the trial court sentenced M.M. to ten years of incarceration as to Count Three and five years of incarceration as to Count Four and ordered that M.M. serve the terms consecutively for an aggregate sentence of 15 years. (*Id.*). The trial court stayed under R.C. 2152.13(D)(2)(a)(iii) the adult portion of the sentence pending M.M.'s successful completion of the juvenile disposition. (*Id.*). The trial court filed an amended judgment entry of disposition on December 11, 2012 "to add the provision that the Serious Youthful Offender is to complete sex offender treatment prior to his release from the secure custody of the Ohio Department of Youth Services." (Doc. No. 72).

{¶6} On December 12, 2012, M.M. filed a notice of appeal. (Doc. No. 73). (*See also* Doc. No. 77). According to this court's records, M.M. voluntarily dismissed his appeal.

{¶7} M.M. filed a motion for judicial release on December 1, 2015, which the trial court denied on December 17, 2015. (Doc. Nos. 89, 90).

{¶8} At the request of the director of DYS, the State filed on June 12, 2017 a motion to invoke the adult portion of M.M.'s serious-youthful-offender-dispositional sentence. (Doc. No. 91); (State's Ex. 2). After a hearing on October 18, 2017, the trial court invoked M.M.'s adult sentence after making the necessary findings under R.C. 2152.14. (Doc. No. 119). The trial court modified the adult sentence imposed in its December 11, 2012 judgment entry of disposition and sentenced M.M. to ten years of incarceration as to Count Three and five years of incarceration as to Count Four and ordered that M.M. serve the terms concurrently for an aggregate sentence of ten years. (*Id.*). The trial court ordered that M.M. be transferred to the Ohio Department of Rehabilitation and Correction. (*Id.*). On November 13, 2017, the trial court filed an amended judgment entry of sentence correcting a typographical error. (Doc. No. 120).

{¶9} On November 15, 2017, M.M. filed a notice of appeal. (Doc. No. 121). He raises two assignments of error for our review, which we will address together.

**Assignment of Error No. I**

**The Trial Court Erred in Finding by Clear and Convincing Evidence that the Appellant's Conduct While in Institutional Care Has Created a Risk to the Safety and Security of the Institution**

## Assignment of Error No. II

**The Trial Court Erred in Finding by Clear and Convincing Evidence that the Appellant's Conduct Demonstrates that He is Unlikely to be Rehabilitated During the Remaining Period of Juvenile Jurisdiction**

{¶10} In his assignments of error, M.M. argues that the trial court erred by imposing the adult portion of his serious-youthful-offender-dispositional sentence. In particular, he argues that there is not clear and convincing evidence supporting the trial court's conclusions that M.M. engaged in conduct that created a substantial risk to the safety or security of the institution and that M.M.'s conduct demonstrates that he is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction.

{¶11} As an initial matter, we must address the standard of review applied to a trial court's imposition of the adult portion of a serious-youthful-offender-dispositional sentence. The Supreme Court of Ohio has stated that "the invocation proceeding [is] similar to the proceedings incident to a criminal court's imposition of a suspended sentence."[1] *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 16. Ohio courts of appeal review the imposition of a suspended sentence for an abuse

---

[1] "In Ohio, courts typically impose two sentences on a criminal defendant: a prison term and a period of postrelease control." *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, ¶ 17, citing R.C. 2967.28(B). "During the period of postrelease control, the defendant is subject to conditions." *Id.*, citing R.C. 2967.28(D)(1). "Violation of these conditions may result in the trial court imposing a prison term." *Id.*, citing R.C. 2967.28(F)(3). "This approach has been characterized as a carrot-and-stick approach because the carrot of rehabilitation without institutional confinement is offered as an inducement to good behavior, even as the trial court retains the stick of imposing institutional confinement. We view the blended sentences imposed on serious youthful offenders in much the same way." *Id.*, citing *In re D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, ¶ 38.

of discretion. *See, e.g.*, *State v. Walton*, 9th Dist. Lorain No. 09CA009588, 2009-Ohio-6703, ¶ 13. *See State v. Michael*, 3d Dist. Henry No. 7-13-05, 2014-Ohio-754, ¶ 21. As such, we review a trial court's decision to impose the adult portion of a serious-youthful-offender sentence for an abuse of discretion. *See In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, ¶ 82 (noting that the juvenile court "has the discretion not to invoke the adult sentence" under Ohio's serious-youthful-offender scheme); *In re Raheem L.*, 1st Dist. Hamilton C-100608, 2013-Ohio-2423, ¶ 17 (Cunningham, P.J., dissenting) (noting that "the juvenile court has the discretion to avoid invoking the adult penalty"). An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157-158 (1980).

{¶12} "A serious-youthful-offender disposition consists of a 'blended' sentence: a traditional juvenile disposition and a stayed adult sentence." *In re D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, ¶ 2, citing R.C. 2152.13(D)(2). "Any adult sentence that the trial court imposes through R.C. 2152.13(D)(2)(a)(i) is only a potential sentence—it is stayed pursuant to R.C. 2152.13(D)(2)(a)(iii) 'pending the successful completion of the traditional juvenile dispositions imposed.'" *Id.* at ¶ 30, quoting R.C. 2512.13(D)(2)(a)(iii). "R.C. 2152.13(D)(2)(a)(ii) requires the court to impose a juvenile disposition when it imposes an adult sentence; how the juvenile responds to that disposition will determine whether the stay is lifted on the adult sentence." *Id.*

**{¶13}** "The court may enforce the adult portion of the sentence at a later time if the juvenile commits certain acts that indicate that the juvenile disposition has been unsuccessful in rehabilitating him." *Id.* at ¶ 2, citing R.C. 2152.14. "R.C. 2152.14(E) governs under what instances a juvenile court may invoke the adult portion of a serious youthful offender's sentence for failure to successfully complete the traditional juvenile disposition." *Id.* at ¶ 31. "The statute requires a finding by clear and convincing evidence that the juvenile is 'unlikely to be rehabilitated during the remaining period of juvenile jurisdiction' and that the juvenile has engaged in further bad conduct pursuant to R.C. 2512.14(A) or (B)." *Id.*, quoting R.C. 2152.14(E). R.C. 2152.14(E) provides, in relevant part:

> (E)(1) The juvenile court may invoke the adult portion of a person's serious youthful offender dispositional sentence if the juvenile court finds all of the following on the record by clear and convincing evidence:
>
> (a) The person is serving the juvenile portion of a serious youthful offender dispositional sentence.
>
> (b) The person is at least fourteen years of age and has been admitted to a department of youth services facility, or criminal charges are pending against the person.
>
> (c) The person engaged in the conduct or acts charged under division (A), (B), or (C) of this section, and the person's conduct demonstrates

that the person is unlikely to be rehabilitated during the remaining

period of juvenile jurisdiction.

R.C. 2152.14(E)(1).

The conduct that can result in the enforcement of an adult sentence

includes committing, while in custody or on parole, an act that is a

violation of the rules of the institution or the conditions of supervision

and that could be charged as any felony or as a first-degree

misdemeanor offense of violence if committed by an adult[.]

*In re D.H.* at ¶ 36, citing R.C. 2152.14(A)(2)(a), (B)(1). In the alternative, "engaging in conduct that creates a substantial risk to the safety or security of the institution, the community, or the victim" constitutes conduct that can result in the enforcement of an adult sentence. *Id.*, citing R.C. 2152.14(A)(2)(b) and (B)(2).

**{¶14}** "[U]nder R.C. 2152.14(E)(2), the juvenile court has the discretion to 'modify the adult sentence the court invokes to consist of any lesser prison term that could be imposed for the offense.'" *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, ¶ 81.

**{¶15}** "The clear-and-convincing-evidence standard allowed by R.C. 2152.14(E)(1) is less rigorous [than the beyond-a-reasonable doubt standard required in criminal trials], though stronger than a mere preponderance-of-the-evidence standard." *In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, at ¶ 20. "[C]lear and convincing evidence is that 'which will produce in the mind of the trier of facts

a firm belief or conviction as to the facts sought to be established.'" *Id.*, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "The standard requires the judge to have a firm belief or conviction about the facts adduced." *Id.*

{¶16} Ohio courts of appeal that have reviewed a trial court's clear-and-convincing conclusions in other contexts will not disturb that conclusion when it is supported by evidence that is legally sufficient to satisfy the clear and convincing standard of proof. *See, e.g.*, *Cross* at 477 ("Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof."); *State v. James*, 3d Dist. Van Wert No. 15-00-02, 2000 WL 681646, *2 (May 25, 2000) ("If a trial court's determination that a defendant is a sexual predator is supported by evidence legally sufficient to meet the clear and convincing standard of proof, it will be not be disturbed by a reviewing court."); *In re Gambrel*, 3d Dist. Logan Nos. 8-02-32 and 8-02-33, 2003-Ohio-1025, ¶ 6 ("In addition, when 'the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.' Thus, we are required to determine whether the evidence was sufficient for the trial court to make its findings by a clear and convincing degree of proof."), quoting *Cross* at 477.

**{¶17}** It is undisputed that M.M. was over 14 years of age and was serving the juvenile portion of his serious-youthful-offender-dispositional sentence at the time of the invocation hearing. (*See* Oct. 18, 2017 Tr. at 1-2); (State's Exs. 1, 2). *Compare In re A.A.W.*, 8th Dist. Cuyahoga No. 101580, 2015-Ohio-1297, ¶ 26. On appeal, M.M. argues that there is not clear and convincing evidence supporting the trial court's conclusion that M.M. engaged in conduct that created a substantial risk to the safety or security of the institution. He argues that "the evidence presented to the Court did not rise to the level of clear and convincing evidence" because "there was no testimony presented by anyone whom had witnessed any of the alleged acts nor of anyone whom [M.M.] admitted any such acts to" and "M.M. denied any such incidents or stated that the incidents did not rise to the allegations made in any of the reports admitted into evidence." (Appellant's Brief at 5). M.M. also argues that there is not clear and convincing evidence supporting the trial court's conclusion that M.M.'s conduct demonstrates that he is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. In particular, he contends that "there was no therapy or programs that [M.M.] was asked to complete that he did not successfully complete." (Appellant's Brief at 7).

**{¶18}** Based on the evidence presented at the hearing, the trial court concluded that there is clear and convincing evidence that M.M.'s conduct created a substantial risk to the safety and security of the institution and that M.M.'s conduct demonstrates that he is unlikely to be rehabilitated during the period of juvenile

jurisdiction. In reaching that conclusion, the trial court focused on the DYS records documenting M.M.'s behavior and noted:

> Those records document the lengthy history of incidents of disruptive behavior of [M.M.] while in institutional care with [DYS]. * * * As recently as October 11, 2017 his behavior required that duty corrections officer [sic] to physically secure [M.M.] and summon other staff assistance to control him and escort him to his locked room. He has repeatedly exposed his genitals to employed staff members, contractual staff and volunteers working at the facility (1/31/2017, 1/12/2017, 1/29/2017, 1/26/2015, 8/6/2014, 4/22/2013, 2/3/2014). He has repeatedly refused to come out of his room and participate in institutional programming designed to assist in his rehabilitation. He has been physical and threatening with staff (7/26/2015, 5/28/2017, 5/29/2017, 3/20/2015) and other residents (7/17/2016, 2/18/2016, 1/8/2013, 7/29/2017).

(Doc. No. 118).

{¶19} After reviewing the record, we conclude that there is sufficient evidence supporting the trial court's conclusions that there is clear and convincing evidence that M.M. engaged in conduct that created a substantial risk to the safety or security of the institution and that M.M.'s conduct demonstrates that he is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction.

{¶20} At the October 18, 2017 hearing, Amy Ast ("Ast"), the Bureau Chief of Facility Operations with DYS, testified that it is her job to "review serious incidents" that occur at DYS facilities. (Oct. 18, 2017 Tr. at 4-5). She described that "a youth behavioral incident report" or "YBIR" is "a report that staff will write if a youth violates a rule" and "depending on the level rule infraction * * * it has certain consequences that goes with it." (*Id.* at 5). She testified that "there are several rule violations," including "rule violations that are considered severe, there's rule violations considered high, some moderate and * * *, some low." (*Id.* at 8). "So, on a YBIR you'll not only see a summary of what the youth did but you will also see the rule violation that he's charged with and then any consequences staff issue." (*Id.* at 5-6). Ast identified State's Exhibit 5 as "a packet" of YBIRs regarding M.M. (*Id.* at 6-7).

{¶21} Ast summarized for the court a number of the incidents described in State's Exhibit 5. In particular, she testified that one YBIR describes an incident involving M.M. on May 6, 2017:

> [M.M.] was upset due to receiving this YBIR prior on Wednesday 5/3, and * * * threatened staff that he had something for her and said just, just wait. Staff asked are you threating [sic] me and [M.M.] stated that it was an F'ing promise because you made me not make my day. * * * He was charged with offensive conduct, and threating [sic] conduct, and lost privileges for up to five (5) days.

(*Id.* at 7-8, 10). On May 10, 2017, M.M. "became upset because staff was conducting a search of his room" "and stated 'you * * * stupid bitch * * * I should spit in your fucking face.'" (*Id.* at 11). On May 21, 2017, M.M. threatened another DYS staff member after he refused to return to his room after "shower time." (*Id.* at 12-13). A May 28, 2017 YBIR involving M.M. reflects that M.M. "was trying to trap staff in the closet" and "was using offensive language toward staff" when he was told that he could not have a television. (*Id.* at 13). On May 29, 2017, M.M. "[s]lapped staff's hands off [a] chair and hit staff in the chest" when he was instructed to not sit on the chair. (*Id.* at 14-15). Based on that offense, M.M. "was charged with assault, offensive conduct, threatening conduct, refusing to follow staff instructions and being out of area" and "went to what [is] call[ed] an administrative hearing, which is the highest level of discipline." (*Id.* at 15).

{¶22} On June 22, 2017, M.M. was involved in an incident in which he made "a false statement" about a staff member in which he referred to her as "being 'his woman.'" (*Id.* at 16-17). On July 2, 2017, a YBIR was issued as a result of M.M. engaging in "[o]ffensive conduct and threatening conduct" for making threats to a staff member. (*Id.* at 18). The next day, a YBIR was issued as a result of M.M. engaging in "[o]ffensive conduct, threatening conduct, being out of area, [and] refusing to follow staff directions" after he "was upset about not getting his made [sic] day snack, and began cussing at staff, threatening staff, and refus[ing] to go back upstairs to his pod." (*Id.*).

{¶23} On July 20, 2017, a YBIR was issued alleging "[d]amage or destruction of property, offensive conduct, misuse and abuse of property, [and] refusing to follow staff instructions" when M.M. "went and threw water all over 'A' pod, ripped the buffer pad off and proceeded to scratch up the floor that he had already waxed" after he was told "that he would no longer be" cleaning with another youth. (*Id.* at 18-19). The next day, a YBIR was issued when M.M. called a staff member "a bitch times three (3), and threatened to beat his ass and then pushed [him] times two * * *." (*Id.* at 19).

{¶24} Ast testified that "[a]fter conducting a video review on 7/31, it was discovered that on 7/29, approximately 10:15 a.m. [M.M.] assaulted [another youth] by hitting him in the head area and pushing him * * *." (*Id.* at 20). On September 8, 2017, M.M. threatened to punch a staff member. (*Id.*). Finally, on September 20, 2017, a YBIR was issued alleging that M.M. engaged in "[o]ffensive conduct, threatening conduct, out of area, [and] refusing to follow staff instructions" after M.M. refused to discontinue a phone call and "cussed" at and threatened a staff member. (*Id.* at 21).

{¶25} Ast testified that DYS also uses "Youth Incident Summary Reports" to document more serious incidents. (*Id.* at 22). Ast identified State's Exhibit 4 as the Youth Incident Summary Reports regarding M.M. from 2012 until October 11, 2017. (*Id.* at 23-24). She summarized a number of the Youth Incident Summary Reports described in State's Exhibit 4. In particular, on January 12, 2017, M.M.

made "inappropriate sexual comments" to a staff member. (*Id.* at 24-25). On January 21, 2017, M.M. was "placed in seclusion" for assaulting another youth. (*Id.* at 26-28). On January 31, 2017, a Youth Incident Summary Report was issued alleging that M.M. "engaged in sexual misconduct" when he "exposed his penis to [a staff member] and made a disrespectful comment as he pleasured himself." (*Id.* at 29).

{¶26} On March 19 and April 18, 2017, Youth Incident Summary Reports were issued as a result of M.M.'s refusal to obey staff orders. (*Id.* at 31-32). On May 13, 2017, a report was issued alleging that M.M. was "out of area and complicit[]" in an incident in which another youth's door was "kicked open." (*Id.* at 33). Ast testified that M.M. was observed in security-video footage kicking the door. (*Id.* at 34). A few days later, on May 21, 2017, M.M. threatened a staff member by telling "her that she better not come to work the following day because" he is "tired of her" and has "something planned for her." (*Id.* at 40). The next day, M.M. "climbed up on the sink on the deck and refused to come down" requiring staff to "restrain[ M.M. to] bring[] him down on the mat." (*Id.* at 36). When M.M. was being escorted to his room after that incident, he "attempted to walk out." (*Id.* at 36-37). A staff member received "a small cut on his hand" as a result of the incident. (*Id.* at 37).

{¶27} On July 29, 2017, staff "received a grievance from" another youth alleging that M.M. assaulted him. (*Id.* at 40). According to Ast, after viewing

security-camera footage, M.M. was observed striking the youth in the face. (*Id.* at 41).

{¶28} In August 2017, M.M. was transferred to the Indian River Juvenile Correctional Facility ("Indian River JCF") from the Circleville Juvenile Correctional Facility ("Circleville JCF"). (*Id.* at 41-42, 63). Ast testified that juveniles are transferred to another DYS facility "usually [as the] result of behavioral problems." (*Id.* at 42). After his transfer, on October 6, 2017, a Youth Incident Summary Report was generated alleging that M.M. "picked up" contraband from another youth when the other youth was to be strip searched. (*Id.* at 42-47). On October 11, 2017, M.M. allegedly engaged in threatening behavior toward a staff member requiring the staff member to place M.M. in "a bear hug"; however, M.M. "resisted and cause[d] both [M.M.] and staff to fall to the ground." (*Id.* at 47-48).

{¶29} On cross-examination, Ast testified that every youth incarcerated at DYS undergoes

> a review with their treatment team; which involves their Unit
> Manager, the Unit Staff that work on that Unit, * * * Case Manager,
> if there is a Case Manager assigned, * * * some of the Teachers if he's
> in school, or if he's a graduate it may be his Boss on his particular job.
> Those, all those people attend a month treatment team on him. So,
> yes there is a review.

(*Id.* at 54). Ast testified that she met with M.M. to discuss his behavior when she was appointed as the temporary superintendent of Circleville JCF in May 2017. (*Id.* at 55). According to Ast, "[T]he previous superintendent had already requested that [M.M.'s adult sentence] be invoked." (*Id.*). Ast "told him the importance of stopping the behavior, not being sexually inappropriate, * * *, acting appropriate, not having disruptive behavior" but she testified that "his behavior reports don't suggest he was successful with that." (*Id.*).

{¶30} On re-direct examination, Ast testified that there were at least two separate incidents in which M.M. assaulted another youth. (*Id.* at 60). Ast testified that she met with M.M. when she became the temporary superintendent of Circleville JCF because she was concerned that he was "not internalizing" his rehabilitative treatment, which is the expectation for youths incarcerated with DYS. (*Id.* at 60-61).

{¶31} Next, Chris Freeman ("Freeman"), the superintendent of Indian River JCF testified that M.M. was transferred to Indian River JCF in August 2017 because "he was having behavioral issues * * * at Circleville and [transferring to Indian River JCF] brought a [sic] opportunity for a different start." (*Id.* at 63). However, since his transfer to Indian River JCF in August 2017, M.M. "received eighteen (18) YBIRs." (*Id.*). According to Freeman, "[M]ost of the * * * offenses were offensive conduct primarily toward female staff[,] threatening conduct, just refusing to follow staff instructions." (*Id.* at 63).

{¶32} On cross-examination, Freeman testified that he met with M.M. on September 7 and October 6, 2017 regarding his behavior. (*Id.* at 67). According to Freeman, he discussed with M.M. "that he need[ed] to stay out of trouble" because the adult portion of M.M.'s serious-youthful-offender-dispositional sentence "was requested to be invoked from Circleville." (*Id.* at 68-69).

{¶33} As its next witness, Dr. Alice Chambly ("Dr. Chambly") testified on behalf of the State that she is a psychology supervisor with DYS. (*Id.* at 70). She testified that DYS utilizes a two-phased sex-offender-treatment program. (*Id.* at 71). The first phase of the treatment program requires offenders to acknowledge their crime "to the satisfaction of a panel of clinicians." (*Id.*). According to Dr. Chambly, M.M. successfully completed the first phase of the treatment program despite "an incident of sexual misconduct." (*Id.* at 72). Dr. Chambly testified that M.M. also successfully completed the second phase of the treatment program notwithstanding "concern that his relapse prevention plan was not as strong as it needed to be." (*Id.* at 72-73).

{¶34} Dr. Chambly identified State's Exhibits 3A and 3B as case notes regarding M.M. from November 14, 2012 through February 5, 2017. (*Id.* at 74-75). She testified that a note prepared on December 20, 2013 regarding M.M.'s completion of the second phase of the sex-offender-treatment program indicates "that he would pass contingent on doing some additional work on he's [sic] relapse prevention plan." (*Id.* at 77-78). Dr. Chambly testified that a note prepared on May

-18-

15, 2014 reflects that M.M. successfully completed the contingencies identified in the December 20 note; however, he was to "continue to do individual work" "[b]ut not within the context of the sex offender program." (*Id.* at 78). When asked whether M.M. has been rehabilitated, Dr. Chambly stated that "[h]e's continued to have incidences of sexually inappropriate behavior" despite his completion of the treatment program. (*Id.* at 81-82).

{¶35} Dr. Chambly testified that M.M. also "participated in substance abuse treatment," "cognitive behavior therapy," "victim awareness," and "anger and aggression treatment." (*Id.* at 81).

{¶36} On cross-examination, Dr. Chambly testified that, although M.M. completed his sex-offender-treatment program, he "refused the sexual misconduct curriculum follow [sic] incidences." (*Id.* at 83). She testified that M.M. "hasn't been successful in his management of his * * * sexual behavior." (*Id.* at 85).

{¶37} On re-direct examination, Dr. Chambly testified that, although M.M. completed his sex-offender-treatment program in 2014, M.M., in January 2017, "exposed himself and made inappropriate comments [to a teacher] while he was masturbating." (*Id.* at 89).

{¶38} M.M. testified on his own behalf and asserted that "some of the incidents" as described by Ast did not occur as the reports reflect. (*Id.* at 90, 93). He testified that, regarding the incident report stating that he assaulted another youth, they were "horse playing" and not fighting. (*Id.* at 94). According to M.M.,

he participated in an administrative hearing regarding that incident during which he explained that he and the other youth "were horse playing" and the other youth "ended up telling [DYS staff] that he was playing that he didn't really mean that [M.M.] assaulted him, he was just irritated at the time." (*Id.* at 95). Regarding the second incident in which it was alleged that he assaulted another youth with a stick, M.M. testified that he "was horse-playing then." (*Id.*). M.M. also denied that he exposed himself to the teacher. (*Id.* at 109). According to M.M., the teacher "said it was another youth" and she did not "come back into the classroom to identify [M.M.] and say that it was [him]." (*Id.*).

{¶39} M.M. testified that he participated in five or six administrative hearings during the time he was in the legal care and custody of DYS. (*Id.* at 96). He testified that he completed a number of treatment programs that he "most definitely" benefitted from. (*Id.* at 97-98, 100). He also testified that he participated in his progress reviews. (*Id.* at 98-99). According to M.M., he "never really had a bad progress review" and "it was never * * * like [he] was on a verge of going to prison." (*Id.* at 99). However, he acknowledged discussing with Ast "that the past superintendent already request [sic] for [his adult] sentence to be invoked." (*Id.* at 100). M.M. addressed the trial court:

> [T]hroughout my whole time * * *, I've done a lot of positive
> things like * * *, I've completed a lot of programming and I've * * *
> never * * * considered myself * * * a bad youth. Like today * * *

them testifying against me it made [it sound] like I was never aware that they felt like that * * * cuz [sic] I was always told a lot that I was doing good. I mean I've had incidents here and there but [a lot of it's not true.]

* * *

Like, I knew * * * what I was * * * up against [with] my [serious-youthful-offender-dispositional sentence]. I would jeopardize that and like my whole time, like my whole time being in DYS I was never on the verge of getting it, my sentence invoked until this year. This year, I don't know what happened because like as my time started getting shorter because my release date is on March 24th, 2018 * * * it seems like stuff been going downhill for some reason.

(*Id.* at 104-105).

{¶40} On cross-examination, M.M. testified that there are three incident reports alleging that he exposed himself to teachers; however, he denied that he exposed himself. (*Id.* at 111-115). M.M. also denied that he had pornography despite a January 12, 2016 report indicating that he had pornography. (*Id.* at 115). According to M.M., he was last involved in a fight "probably 2013-14." (*Id.* at 115-116). Rather, he testified that he was the one that "always got assaulted." (*Id.* at 116). He also denied slapping the hands of a staff member and pushing that staff member in the chest. (*Id.* at 116-117).

{¶41} On re-direct examination, M.M. testified that incidents may have happened on the dates reflected in some of the incident reports, but insisted that what took place was not as severe as reflected by the reports. (*Id.* at 119). He testified that he was not provided notice of many of the incident reports alleging he engaged in bad behavior. (*Id.* at 120-121). M.M. testified that he "had multiple jobs" while incarcerated at DYS, including an "apprenticeship working with maintenance." (*Id.* at 122). However, M.M. testified that he was told that he "was going to [be] remove[d]" from the program because he "was too aggressive inside the institution." (*Id.* at 122-123). He testified that he was "confused" by that accusation because his "level was up" and he "was doing good." (*Id.* at 123).

{¶42} After reviewing the record, we conclude that the evidence was sufficient for the trial court to conclude that there is clear and convincing evidence that M.M.'s conduct created a substantial risk to the safety and security of the institution and that M.M. is unlikely to be rehabilitated during the remaining period of the juvenile court's jurisdiction.

{¶43} M.M.'s arguments that there is no clear and convincing evidence that he engaged in conduct that created a substantial risk to the safety or security of the institution and that he is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction are meritless. As we stated above, the State is not required to prove beyond a reasonable doubt the necessary elements under R.C. 2152.14 to invoke the adult portion of a serious-youthful-offender-dispositional sentence. *See*

*In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, at ¶ 15-16, 20. Rather, there must be sufficient evidence for the trial court to conclude that there is clear and convincing evidence that the adult portion of a serious-youthful-offender-dispositional sentence should be invoked. Accordingly, M.M.'s argument that the State's evidence regarding his involvement in additional bad acts while in the care and custody of DYS is not corroborated does not negate the evidence necessary to satisfy the clear-and-convincing standard of proof. *See State v. Greathouse*, 7th Dist. Jefferson No. 99 JE 58, 2000 WL 875322, *4 (June 29, 2000). Moreover, notwithstanding M.M.'s denials, whether the evidence is to be believed is a matter squarely within the province of the trial court. *See, e.g.*, *State v. Brown*, 10th Dist. Franklin No. 03AP-331, 2004-Ohio-1219, ¶ 13 ("in determining the sufficiency of the evidence, an appellate court must give 'full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts'" and "the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact"), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781 (1979) and citing *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79 and *State v. Thomas*, 70 Ohio St.2d 79, 80 (1982); *In re S.L.*, 3d Dist. Union Nos. 14-15-07 and 14-15-08, 2016-Ohio-5000, ¶ 43 (noting that a "[m]ere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment" when there is a clear-and-convincing standard of proof).

**{¶44}** We conclude that there is sufficient evidence for the trial court to conclude that M.M. (1) engaged in separate conduct or additional bad acts that (2) created a substantial risk to the safety or security of the institution and (3) that demonstrated that he is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. State's Exhibit 4—DYS Youth Incident Summary Reports— reflects approximately 75 reports from December 11, 2012 through October 11, 2017 detailing incidents in which M.M. was alleged to be "involved" or an "active participant." (*See* State's Ex. 4). *Compare In re A.A.W.*, 2015-Ohio-1297, at ¶ 4 ("Significant incidents are documented in a 'Youth Incident Summary Report.' A.A.W.'s report describes over 80 incidents of violence, disruptive behavior, rule violations, and possession of contraband."). Those incidents include, for instance, acts of violence, sexual misconduct, gang involvement, disruptive behavior, possession of contraband, and rule violations. (*See* State's Ex. 4). Likewise, State's Exhibit 5—DYS YBIRs—reflects 43 reports from April 19 through September 18, 2017 detailing incidents in which M.M. violated DYS rules. (*See* State's Ex. 5).

**{¶45}** Although M.M. successfully completed the DYS sex-offender-treatment program in 2014, the record reflects that M.M. continued to engage in sexually inappropriate behavior. *Compare In re A.A.W.* at ¶ 28 (noting that "despite 319 hours of treatment and 368 sessions, [a DYS social worker] did not observe any improvement in A.A.W.'s attitude or behavior"). Indeed, M.M. engaged in sexually inappropriate behavior as recently as January 31, 2017. Moreover, M.M. refused

"sexual misconduct curriculum" following incidents in which he engaged in sexually inappropriate behavior.

{¶46} M.M.'s behavior did not improve after he learned that the superintendent of the Circleville JCF requested that his adult sentence be invoked. The record reflects that M.M. was informed about that request as late as May 2017. Nevertheless, of the 43 YBIRs reflected in State's Exhibit 5, 25 were issued for rules violations occurring after June 1, 2017. (State's Ex. 5). Likewise, State's Exhibit 4 reflects that M.M.'s behavior resulted in five Youth Incident Summary Reports for incidents occurring after June 1, 2017. (State's Ex. 4).

{¶47} M.M. was transferred to a different JCF in August 2017 for a "fresh" start; however, he continued to engage in bad conduct, which resulted in the issuance of 18 YBIRs. M.M. was provided numerous opportunities to change his behavior; yet, the evidence in the record reflects that M.M. continued to engage in bad conduct. Despite the numerous opportunities presented to M.M. to change his behavior, M.M. continued to engage in conduct that created a substantial risk to the safety and security of the institution. Furthermore, that M.M. continued to engage in bad conduct demonstrates that he is unlikely to be rehabilitated in the remaining period of juvenile jurisdiction. *See In re J.V.*, 134 Ohio St.3d 1, 2012-Ohio-4961, at ¶ 4 (noting that invocation of an adult sentence is appropriate when a juvenile "'engage[s] in separate conduct detrimental to his own rehabilitation in the juvenile system.'") quoting *In re D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, at ¶ 38.

**{¶48}** M.M.'s testimony also sheds light on whether he is likely to be rehabilitated in the juvenile system. Of particular concern is M.M.'s failure to take responsibility for his actions by denying that the incidents happened, shifting blame, or claiming to be the victim. Most impactful to M.M.'s credibility is his denial, despite testimony to the contrary, that he was informed that DYS staff requested the invocation of the adult portion of his serious-youthful-offender-dispositional sentence based on his poor behavior. Notwithstanding that denial, M.M. testified that he was removed from his job by the Circleville JCF superintendent because of his "aggressive" behavior.

**{¶49}** The foregoing facts sufficiently produce a firm belief or conviction that M.M.'s conduct created a substantial risk to the safety and security of the institution and that M.M. is unlikely to be rehabilitated during the remaining period of the juvenile court's jurisdiction. *See In re A.A.W.* at ¶ 30 ("The record contains clear and convincing evidence to support the court's finding that A.A.W. was unlikely to be rehabilitated within the remaining period of juvenile jurisdiction. There was no evidence that A.A.W. would be rehabilitated in the foreseeable future, but he posed a continuing threat to the staff and youth in ODYS."). That is, the evidence was sufficient for the trial court to conclude that there is clear and convincing evidence that M.M. engaged in additional bad acts as described in R.C. 2152.14(A)(2)(b) which demonstrate that it is unlikely that M.M. could be rehabilitated in the juvenile system. *See In re J.V.* at ¶ 9 ("'the court must find by

clear and convincing evidence not only that the person serving the juvenile portion of an [serious-youthful-offender-]dispositional sentence engaged in the conduct—the additional bad act—he is accused of, but also that the conduct "demonstrates that [he] is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction"'"'"), quoting *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, at ¶ 81, quoting R.C. 2152.14(E)(1).  Therefore, the trial court did not abuse its discretion by imposing the adult portion of M.M.'s serious-youthful-offender-dispositional sentence.

{¶50} M.M.'s assignments of error are overruled.

{¶51} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**