[Cite as *In re T.T.*, 2021-Ohio-759.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

In re T.T.

Court of Appeals No. L-19-1280

Trial Court No. JC16259440

**DECISION AND JUDGMENT**

Decided: March 12, 2021

* * * * *

Timothy Young, Ohio Public Defender, and Abigail Christopher,
Lauren Hammersmith, Assistant State Public Defenders, for appellant.

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, T.T., a minor child, appeals the October 31, 2019 judgment of the
Lucas County Court of Common Pleas, Juvenile Division, invoking the adult portion of
her serious youth offender sentence. For the following reasons, we affirm the trial court
judgment.

## I. Background

{¶ 2} On December 7, 2016, T.T. shot her 15-year-old brother in the chest with a shotgun, killing him. T.T. was 14 years old. A delinquency complaint was filed in the Lucas County Court of Common Pleas, Juvenile Division, alleging murder, a violation of R.C. 2903.02(B), an unclassified felony. The complaint specified that a firearm was used in the commission of the offense.

{¶ 3} The state moved for a discretionary transfer of the case to the Lucas County Court of Common Pleas, General Division, under R.C. 2152.10(B) and 2152.12(B). Following a hearing, the court denied the state's motion. On July 12, 2017, by way of information, the state added a second count to the complaint for murder under R.C. 2903.02(B) and (D), with a firearms specification under R.C. 2941.145, and a mandatory serious youth offender ("SYO") specification under R.C. 2152.11(C)(1).

{¶ 4} On August 16, 2017, T.T. entered an admission to the delinquency complaint and a plea of guilty to Count 2. The juvenile court found T.T. guilty and adjudicated her a delinquent child. On August 31, 2017, the court conducted a SYO disposition sentence hearing under R.C. 2152.11(B)(1) and 2152.13. On Count 2, the adult conviction, the court sentenced T.T. to an indefinite term of 15 years to life in prison and five years of post-release control. As to the delinquency adjudication, under R.C. 2152.16, the juvenile court committed T.T. to the custody of the Department of Youth Services ("DYS") for secure confinement until T.T. reaches the age of 21. Under

2.

R.C. 2152.13(D)(1)(c), the court stayed the adult portion of the SYO dispositional sentence pending successful completion of the traditional juvenile disposition.

{¶ 5} On March 13, 2019, approximately two months before T.T. turned 17, the state moved to invoke the adult portion of the SYO disposition under R.C. 2152.14(A)(1) and (2). It alleged that while in DYS custody, T.T. had committed several acts of misconduct, including acts that are in violation of the rules of the institution and that may constitute a felony or first-degree misdemeanor of violence if committed by an adult, including felony assault, aggravated menacing, and misdemeanor assault. The state maintained that T.T.'s conduct creates a substantial risk to the safety and security of the institution and to those who work or reside there.

{¶ 6} T.T. moved to dismiss the state's motion, arguing that she had not been admitted to a DYS facility for purposes of R.C. 2152.14(E)(1)(b), so her adult sentence could not be invoked. The court denied T.T.'s motion.

{¶ 7} The court conducted a hearing on September 27, 2019. The parties elicited testimony from numerous witnesses, including G.W., a former youth specialist at Montgomery County Center for Adolescent Services ("CAS"), who T.T. assaulted in September of 2018; Stephanie Wood, a former youth specialist at CAS; Albertina Mitchell, a clinical intake coordinator at CAS; William Schaffer, the program director for CAS; Jessica Jefferson, the female program administrator for DYS; Raenita Weir, T.T.'s mental health and substance abuse therapist; B.C., T.T.'s mother; and Drs. Charlene Cassel and Mark Babula, psychologists who evaluated T.T. and offered opinions as to

3.

whether T.T. could be successfully rehabilitated in the time she had remaining in DYS. Their testimony is summarized below.

## A. G.W.

{¶ 8} G.W. is employed as a mental health technician at Dayton Children's Hospital. She was previously employed by CAS as a youth specialist. Youth specialists oversee the daily functioning of the residents. T.T. came to CAS around August of 2017, but G.W. did not begin working there until April of 2018.

{¶ 9} G.W.'s relationship with T.T. was "hit or miss." Throughout G.W.'s time at CAS, there were days when T.T. was fine, but there were other days where she swore at G.W. and exhibited aggression over little things. G.W. said that when T.T. behaved poorly, it lowered the morale of the unit and agitated things.

{¶ 10} In September of 2018, three residents assaulted G.W. One of them hit her with a broomstick, one hit her in the head and pulled her hair, and T.T. hit her with a crutch until it broke. G.W. suffered a contusion to her left forearm and a concussion. She missed a few shifts of work because of the incident. Following the incident, she suffered headaches and migraines from the light of the computer screen, she could not be around the kids, and she was mainly confined to housekeeping duties. G.W. has a bachelor's degree in psychology and is working on her master's degree in social work.

{¶ 11} After the assault, G.W. sought treatment by two social workers at Wright Patt Medical. She eventually returned to her regular duties. Her relationship with T.T. remained hit or miss.

4.

{¶ 12} G.W. conceded on cross-examination that she suffered from PTSD before the incident with T.T. and was already treating with one of the two social workers at Wright Patt. She also testified that while she has witnessed other violent behavior between residents and has seen T.T. engage in physical fights with her peers, the September 2018 incident was the only time she was assaulted at the unit.

{¶ 13} Further describing her assault, G.W. recalled that on the day she was assaulted, T.T. was sitting down. G.W. called a code and the residents were supposed to go to their doors and remain at their door until it was shut and locked secure. She does not believe that T.T. went to her door like she was supposed to, but she agreed that if the video of the incident shows otherwise, then she would be wrong.

### B. Stephanie Wood

{¶ 14} Stephanie Wood was a youth specialist at CAS for a year and one-half, but is now a court services officer. While at CAS, she had nearly daily contact with T.T. She described T.T. as a "bright and talented young lady," but feels that T.T. uses her talents to manipulate her peers. She can be "oppositional" and her behavior is "unpredictable." She inserts herself into situations and conflicts even when they have nothing to do with her. "She has no respect for authority whatsoever" and tries to intimidate staff. She will change her behavior to get something she wants, but if you have nothing to offer her, she will not speak to you or be kind. T.T. links up with girls, forms romantic relationships, then girls who were not previously acting out suddenly begin to act out.

5.

{¶ 15} Wood has witnessed T.T. engage in physical aggression and altercations toward her peers. She has threatened Wood. Wood was on the unit when G.W. was assaulted. T.T. and two other girls attacked G.W. One used a broom, another pulled her hair and hit her, and T.T. beat her over the head with a crutch until it broke. Wood grabbed the crutch, but T.T. ran to grab the other crutch. T.T.'s girlfriend eventually persuaded her to retreat into her room. Wood does not know exactly why T.T. had crutches—she was complaining about her ankle or foot bothering her.

{¶ 16} T.T. confronted Wood during a customary pat down in August of 2019. While patting T.T. down, she noticed that T.T. was wearing brown underwear that were not part of her uniform. Wood asked T.T. about it and T.T. flung her arm back and hit her with her arm. She then began swearing at her and became physically aggressive and hostile. During a more recent incident, T.T. began taking off her clothes at an inappropriate time. Wood was instructed by her supervisor to record T.T.'s behavior and T.T. said "I'll turn that off myself bitch"—other staff stopped T.T. from getting to Wood.

{¶ 17} Wood feels that T.T.'s behavior affects programming at CAS. There can be stretches of weeks that T.T. behaves, follows directions, and needs little redirection. But there are times that she is very disruptive. T.T.'s romantic relationships with the girls have also been harmful. Romantic relationships are not allowed at CAS.

{¶ 18} Wood said that she has not seen changes in T.T. since she first started dealing with her at CAS. "Her behaviors remain erratic." She has not seen progress

6.

toward rehabilitation. Wood would not describe T.T.'s behavior as typical of other residents' behavior.

{¶ 19} Wood described the procedure that is supposed to be followed when a code is called. Residents that are not involved are supposed to step into their rooms. Many times they have to be restrained and put into their rooms. During the assault on G.W., T.T. initially went to the door like she was supposed to, but she did not enter her room. Wood does not know if the door was locked.

{¶ 20} During a routine pat down, residents are supposed to line up against the wall and take off their shoes. The workers wear gloves. They feel around the resident's sweatshirt and around her bra and shake it to make sure that nothing is being hidden in it. They use their thumbs and feel around the waistband of the resident's pants, not really touching the person—just her pants. They feel her ankles and check her shoes. She could see T.T.'s underwear before even doing the patdown, and saw they were not CAS property. T.T. said she smuggled them from the jail. Wood simply asked her about them and T.T. became hostile.

{¶ 21} CAS has a system whereby residents can earn things with points they accumulate. When a resident commits an infraction, they lose points. If they are placed on a behavior contract, they are restricted from certain activities. T.T. has had bouts of good behavior when she wants to, but she seems to not want to. Wood finds this unfortunate because she believes T.T. is very intelligent and talented.

7.

{¶ 22} Any time the kids go out of the facility and come back, they need to be strip searched. They go into a restroom and take off their clothes while a staff member stands outside with the door cracked. They have to squat and cough and she has to check their clothing. Wood had to strip search T.T. when she returned from court in Toledo.

{¶ 23} Wood answered several questions by the court. She testified that CAS has 15 beds for DYS girls and 10 beds for county girls. T.T. is in one of the 15 DYS beds. CAS also has two units for boys.

### C. Albertina Mitchell

{¶ 24} Albertina Mitchell, a social worker, is a clinical intake coordinator at CAS. She has been working with youths for 37 years. She started working at CAS just before it began accepting DYS girls in December of 2013. Mitchell was on medical leave when T.T. was first admitted to CAS; she returned from leave about four months after T.T.'s admission.

{¶ 25} Mitchell reviewed T.T.'s diagnostics when she returned from medical leave. One of her duties is to evaluate what services the residents are getting and how they are functioning on the unit. She also performs crisis intervention and assesses suicidal behavior and threats to others. Mitchell does not engage in direct therapy with T.T. She provides support and assistance to primary therapists, family therapists, and treatment specialists. She helps facilitate programming.

8.

{¶ 26} T.T. is cooperative with Mitchell. She has had perhaps two negative experiences with T.T. T.T. behaves differently with other staff. She is more argumentative and oppositional, particularly with youth specialist supervisors.

{¶ 27} Raenita Weir is T.T.'s primary therapist and is contracted to CAS through South Community Behavioral Health. T.T. speaks with Weir about once a week. Weir and T.T. started off well—T.T. was actively engaged in treatment and they were working well together. Their relationship hit some difficulties. Weir has asked for Mitchell's suggestions for addressing a patient who is oppositional and aggressive. T.T. was becoming verbally and physically aggressive towards Weir, positioning herself in a threatening, intimidating manner. Mitchell reassured Weir that she had to confront T.T.'s behavior and explain the importance of therapy and the necessity of change.

{¶ 28} In addition to individual therapy, T.T. has been involved in a number of groups at CAS including Motivation to Change and Girls Moving On. These programs focus on moral decision-making, anger management, healthy choices, and prosocial behavior. T.T.'s primary clinician and group leaders set goals for T.T. If she is not meeting her goals, that could be addressed at clinical team meetings.

{¶ 29} Mitchell has had limited need to intervene with T.T. because T.T. is pretty appropriate in speaking with Mitchell. There was one incident earlier in the year when she made a comment on a grievance that suggested she might harm herself. She has not been involved with T.T.'s rule infractions.

9.

{¶ 30} T.T. is having a difficult time at CAS. While Mitchell has seen motivation from an academic perspective, T.T. is easily agitated and does not respond well to correction. She becomes argumentative and defiant. She has heard of physical aggression by T.T. against others. She is selective about who she will cooperate with. She has difficulties following routines and expectations at CAS. T.T.'s behavior affects staff—the staff is stressed and anxious about approaching her or making requests of her. She can get volatile and explosive and this affects the other kids too.

{¶ 31} On cross-examination, Mitchell conceded that T.T. is not the only volatile resident, but she maintained that this behavior is not as frequent or intense with the others. She has not seen improvement from T.T. She may be less disruptive or aggressive, but she is not progressing. Mitchell has seen girls make progress at CAS, but T.T. is not. While T.T. is not as oppositional towards Mitchell, Mitchell is not the one giving her day-to-day directions—she is more oppositional with staff who have to give routine directions. Mitchell acknowledged that being at CAS is stressful. She stated that she does not know if T.T. is smart, but T.T. is passing her classes.

### D. William Shaffer

{¶ 32} William Schaffer is the program director for CAS. He has been employed by Montgomery County Juvenile Court since 1997. He has been at CAS since 2011, and has been its program director since 2015.

{¶ 33} Since the time he started in 1997, the juvenile system has become more rehabilitation-focused and has expanded the scope of services to treat specific behaviors,

10.

including sex-offender specific behavior or trauma behavior. The scope of treatment and academics has also expanded.

{¶ 34} Shaffer discussed the programming at CAS. Residents start with Motivation to Change, a four-week program through the University of Cincinnati that helps identify a need for a change in behavior, linking thoughts and behaviors together and working to identify and address the real issue at hand. Equip is a ten-week phase that focuses on anger management, moral reasoning, and social skills. Cognitive behavioral therapy ("CBT") works to link thoughts and behavior. Strengthening Family provides family sessions and focuses on engaging the family in the child's treatment. Reentry is a four-week phase that focuses on graduated home visits and skills to apply when residents face triggers in their communities. CAS also offers educational and some vocational opportunities.

{¶ 35} Youth specialists work on the front line at CAS. Staff attempts to provide verbal redirection and offer alternatives to negative behavior before punishing a child for infractions. Staff has been trained in restraining youth who engage in behaviors that pose an immediate risk to safety and security, but it is a last resort.

{¶ 36} Shaffer communicates with T.T. approximately every other day, but he works with her in a limited capacity, only as needed. She comes by to say hello and goodbye, and speaks with him about her concerns, complaints, and questions. He has a positive relationship with her. She takes redirection from him when provided and generally is not argumentative with him. He has received feedback from staff, however,

11.

that they struggle with her. She is disrespectful and argumentative. He has witnessed her become argumentative or agitated with staff. T.T. is more receptive to redirection received from him than from other staff.

{¶ 37} Rae Weir is T.T.'s therapist. She is a contract therapist assigned to CAS 40 hours a week. She has a standing weekly appointment with T.T. She also conducts "resets" with T.T. to discuss behaviors or concerns and provides an opportunity to help T.T. improve her behavior.

{¶ 38} Weir came to Shaffer and said that she was having issues with T.T. She expressed frustration at T.T.'s hostility and oppositional behavior. At the beginning of the year, T.T. was blaming Weir for incidents and behaviors and for her lack of progress in therapy. Shaffer spoke to Weir and another staff member spoke to T.T. T.T. was told that to make progress she needed to overcome and work through her issues. He observed that when things are not beneficial to T.T., her custom is to ask for something else to change—she never sees anything through to the end.

{¶ 39} T.T. left CAS for two months and went to Pomegranate. Pomegranate is a facility that DYS contracts with to provide alternative programming that focuses more on mental health or drug and alcohol needs. Pomegranate is a locked facility but it is considered a stepdown because it is more relaxed. The living environment is more residential than correctional and the girls are allowed to have personal effects and items that they're not allowed to have at CAS. T.T. was there for two months, then returned to CAS. Shaffer does not know the reason for her return to CAS.

12.

{¶ 40} Shaffer went over a summary of T.T.'s rule infractions during her time at CAS, which were marked as an exhibit. They covered the period of September 8, 2017, to September 10, 2019. They are broken into two categories: (1) higher level, aggressive infractions, and (2) lower level, oppositional and self-control. T.T. has had 53 higher level infractions—23 for physical interactions directed toward her peers or staff.

{¶ 41} In terms of the number of infractions T.T. has received as compared to others, she falls on the higher end, even taking into account that she is in a DYS unit. The infractions are spread over a good period of time, which Shaffer said demonstrates consistent negative behavior. Other girls with more infractions tend to have more significant mental health diagnoses and engage in more self-harm or lethal types of behavior than T.T.

{¶ 42} What stands out to Shaffer about T.T.'s behavior is that she is making purposeful choices. He has seen her follow his directives, yet she doesn't follow other staff directives—this tells him this is a choice she is making and it is not impulsive. "She's choosing the right person at the right time that she feels she would have the best outcome with."

{¶ 43} T.T. is difficult, argumentative, and disrespectful to the staff. Her disrespect wears on them. They consistently deal with the same issues with her day in and day out. Sometimes it is a minor issue, but it is so repetitive that it wears them out. A few staff, Shaffer included, have an amicable relationship with T.T. But newer staff

13.

are apprehensive to work with her, and many staff are more on guard with her than usual and hesitant to work with her.

{¶ 44} T.T.'s behavior affects the running of CAS. She easily manipulates other residents, drives the tone and the mood of the unit, and impacts behaviors. She is viewed as "the one that is kind of pulling the strings behind the scenes." She inserts herself into situations that don't involve her. She presents a safety risk to the facility because she is a "wild card."

{¶ 45} Shaffer has talked to T.T. about the fact that she is a SYO. He has provided her with encouragement in the program. Others reinforce with her that she has SYO status, so she knows that the adult sentence is hanging over her head. This knowledge has not had an impact in reducing her negative behaviors.

{¶ 46} Shaffer has seen successful youth at the facility. But based on his experience and training, he does not expect to see long-term improvement with T.T. She has shown that she *can* do what is expected of her, but Shaffer does not believe she does it for the true purpose of making change. He believes that she tries to get people comfortable "while she's sizing up her next opportunity." He does not believe she is internalizing what she needs to do to be successful in the community.

{¶ 47} On cross-examination, Shaffer clarified that T.T. is a few months short of two years into her time at CAS. She is supposed to be there until she is 21, which means she has approximately three years left. He agreed that it is possible to have periods of improvement and periods of no improvement. He also agreed that it is not a good idea to

14.

give up on a child. He conceded that if T.T. decided she wanted to be successful at CAS, she could be, but she has consistently behaved in a manner that is contrary to any expressed commitment to the program.

{¶ 48} Shaffer agreed that the largest percentage of T.T.'s infractions at CAS are lower-level infractions. Sixty-eight percent were lower level, such as failure to maintain hygiene, failure to place her shoes outside her room, profanity, and improper uniform. But Shaffer insisted that he would not be in court if all they were discussing were these types of low-level infractions. There are 23 physical aggression infractions.

{¶ 49} Shaffer recalls seeing T.T.'s mother once. He does not know anything about her personal circumstances. He is aware that she relies on others for transportation.

{¶ 50} On redirect, Shaffer confirmed that up until January of 2019, T.T. had 87 infractions. As of the time of the hearing (September 2019), she had 161 infractions: 108 were lower-level infractions, and 53 were higher level. In the last eight months, 30 percent of her infractions have been higher level.

### E. Jessica Jefferson

{¶ 51} Jessica Jefferson is the female program administrator for DYS. She has worked for DYS for 21 years. Her role is to oversee all the females that come into the department and to decide whether they should stay at DYS or whether they should be transferred to a stepdown facility. Jefferson meets with the girls every week, decides on their treatment, and makes sure they get an education. Essentially, she acts as their guardian.

15.

{¶ 52} CAS gives Jefferson information about T.T.'s progress. She talks to T.T. at least once a week. She talks with her about her behavior, her progress, and things she needs to work on. About once a month, she reminds T.T. of her SYO status and cautions her to watch everything she does because her SYO could be revoked. She asks T.T. what she can do to help.

{¶ 53} T.T. is very intelligent and has much potential. She can do "anything she wants to do if she puts her mind to it, but she has to decide to do it." Jefferson reported that when T.T. first entered DYS, she did "amazing." As time went on, the number of incident reports increased and her behavior regressed. Jefferson would talk to her and she seemed to listen. Sometimes her behavior would improve, but sometimes she would regress.

{¶ 54} Jefferson allowed T.T. to transfer to a stepdown facility called Pomegranate. While it is considered a stepdown, Pomegranate is stricter. The rules must be followed, and girls who cannot deal with that cannot stay. T.T. was at Pomegranate from February 24, 2018, to April of 2018. Usually, Jefferson gives a girl six months to "get it together"; T.T. got sent back to CAS after two months. Jefferson told her that if she gets herself together, she can go back to Pomegranate again. T.T. has not gotten her behavior up to Pomegranate standards.

{¶ 55} Jefferson documented the times she has spoken with T.T. about her SYO status. She does this with all the girls under SYO. She has had successful girls at DYS.

16.

She feels that T.T. is internalizing the building blocks she is given, but it is up to her to make the changes. She knows what she has to do, but it is up to her to do it.

{¶ 56} On cross-examination, Jefferson clarified that when girls are no longer fighting or violent, she gives them a chance at Pomegranate or Applewood, both of which are stepdowns. It is a good thing to be sent to Pomegranate; a resident should want to do it. T.T. was permitted to go to Pomegranate because of the improvement she had shown at CAS. She came back because she was not following the rules. She has had other girls who have had to be sent back, but were then able to return to Pomegranate. It is up to T.T. to do what she would need to do to return to Pomegranate. If she does those things, Jefferson would recommend it if the department allows it.

{¶ 57} Jefferson has had contact with T.T.'s mother a couple of times. She knows that T.T. speaks to her on the phone, but she does not know how often. After speaking with her mother, sometimes T.T.'s behavior is good, and sometimes it is bad, depending on how the conversation went.

{¶ 58} Jefferson was shown some of her notes. One of them was from December 26, 2018. She noted that T.T.'s behavior had improved "by not victimizing others, but she needs to have a more positive attitude and follow staff direction without giving any negative feedback." There was a note from February 27, 2019, indicating that T.T. had been doing well and desired more art therapy and the opportunity to participate in more educational opportunities. A note from March 18, 2019, acknowledged that T.T. participated in a video call with her mother and behaved appropriately and prosocially. It

17.

indicated that T.T.'s goal was to return to Pomegranate and that she appeared motivated to advance and change her behavior. T.T. was counseled that a recent incident involving her girlfriend created a barrier to her success. T.T. expressed that she was excited to graduate and wants to attend college. The notes indicate that facility expectations and parole contact were discussed with T.T.

{¶ 59} Jefferson agreed that if T.T.'s actions were consistent with her words, this would suggest positive forthcoming behavior from T.T. She believes T.T. has potential and is capable of rehabilitation, but "that's up to [T.T.]."

{¶ 60} On redirect, Jefferson was asked to review a February 27, 2019 note that indicated that T.T. was not making good progress in resolving conflicts with staff and thinking before she reacts. Her "behavior continues to regress." She reviewed a note from September 4, 2019, stating that T.T. needs to deal with conflict using her coping skills and describing her progress as inconsistent. "[T.T.] understands that she is an SYO and cannot allow her feelings to cause her to victimize others."

### F. Raenita Weir

{¶ 61} Raenita Weir is T.T.'s mental health and substance abuse therapist. She is employed by South Community Behavioral Health and is contracted to work at CAS.

{¶ 62} Weir worked with T.T. on trauma-focused CBT. CBT helps to identify triggers and stressors and evaluate thinking errors to develop alternative thoughts and actions. Weir also utilizes dialectical behavioral treatment, which is similar to CBT. It

18.

focuses on the person and how they handle situations, emotional regulation, mindfulness, etc.

{¶ 63} T.T. responded well to CBT for a while, but starting around September of 2018, T.T. chose to discontinue CBT. She was getting ready to present her trauma narrative when she decided to leave. She can resume CBT if she wants to, but she has not done so. Weir does not know why T.T. has not chosen to resume CBT, but by not working past her trauma, T.T. has not allowed herself to heal. Weir said that T.T. will always have trauma reminders—flashbacks, nightmares, avoidance, and other distress— if she does not work past it. She believes that T.T. needs this treatment, but T.T. has to be open to it.

{¶ 64} T.T. is sentenced to be in the juvenile system until she is 21, unless the court decides to invoke her SYO status, in which case it will be longer. Whether T.T. is capable of doing what needs to get done within three years is "completely, utterly up to [T.T.]." T.T. "is in charge of her change and her decision to change or not to change." Weir believes everyone is capable of improvement.

## G. B.C.

{¶ 65} B.C. testified that because she does not drive on the expressway, she has visited T.T. at CAS only a few times. She has gone for scheduled visits with T.T.'s parole officer and when a friend has taken her. She usually talks to T.T. on the phone a couple times a week. T.T. is able to earn one free phone call a week, and they may talk more often if B.C. has money to put on the phone. T.T. has an older sister, older brother,

19.

and younger brother.  B.C. misses T.T. and she knows T.T. misses her family.  T.T. especially misses B.C.'s middle son.

{¶ 66} T.T. tells B.C. that life at CAS is sometimes good and sometimes bad.  T.T. did not do well in school when she was at home, but she is doing well now and is looking forward to graduating.

{¶ 67} T.T. told B.C. that she was asked to lead a group last December.  T.T. was excited about that, and B.C. believes that being asked to lead a group demonstrates improvement.  B.C. believes that T.T. can get the help she needs from the state within three years.  She feels that it is never too late to improve, and T.T. expresses that she has hopes and dreams.  T.T. is still trying, even with the chaos of her surroundings.

### H.  Dr. Charlene Cassel

{¶ 68} Dr. Cassel examined T.T. in 2017—when T.T. was 14—in preparation for her bindover hearing.  At that time she recommended that T.T. remain in the juvenile system.  She evaluated T.T. again in connection with the state's motion to invoke the adult portion of T.T.'s sentence.  She prepared a report of her evaluation.

{¶ 69} T.T. has made some improvements during her time at CAS, particularly in the area of academics.  Before T.T. was arrested, she had been skipping school a lot.  Since her detention, she has worked hard at school and has developed interests in writing and music.

{¶ 70} T.T. views herself as doing much better in DYS than the records indicate.  Dr. Cassel reviewed records of incidents from CAS that involved T.T.  T.T. downplayed

20.

her responsibility for the incidents, offered explanations, and blamed others for her discipline problems. T.T. has had difficulties with corrections officers and with her therapist.

{¶ 71} Dr. Cassel expressed skepticism concerning how much progress T.T. would make in the future. She noted that T.T. has demonstrated a pattern of not obeying rules, pushing the limits, and doing as little as possible to change her criminalistic thinking despite engaging in services through DYS that were designed to correct these thoughts and behaviors.

{¶ 72} T.T. reported to Dr. Cassel that she felt depressed and anxious. Dr. Cassel did not observe anxiety in T.T., but she did observe depression. She is aware that Dr. Babula diagnosed T.T. with adjustment disorder; she disagrees with that diagnosis. Dr. Cassel previously tested T.T. for intellectual disabilities and found that T.T. had mild mental retardation, but Dr. Cassel is not convinced of the accuracy of those results because T.T. exhibits a high degree of street smarts. She believes the tests underestimated T.T.'s intellectual functioning.

{¶ 73} Dr. Cassel diagnosed T.T. with attention deficit disorder and oppositional defiant disorder. She questioned whether to add a diagnosis of conduct disorder. Dr. Cassel found certain traits of antisocial personality disorder prevalent in T.T. Those traits include impulsivity, the inability to learn from past experience, low tolerance for frustration, and the inability to accept responsibility for one's actions. But a person under age 18 cannot be diagnosed with antisocial personality disorder.

21.

{¶ 74} As part of her evaluation of T.T., Dr. Cassel inquired about the assault of G.W. T.T. described that she returned to her cell when the fight broke out, but could not enter the cell because it was locked. She then decided to "even up the situation" by getting involved and in doing so, struck a corrections officer who was fighting with another inmate. This assault was one factor that Dr. Cassel took into account in arriving at her opinion in the case.

{¶ 75} Dr. Cassel performed MMPI testing of T.T. Since the last time she administered the test to T.T., she has shown some improvement in terms of expressing her feelings, but she is still immature, impulsive, and fails to take responsibility or learn from past actions. The results of that test suggest that she is egocentric, insensitive, self-indulgent, and distractible. Some of this will change as she ages, but some will not. She observed that T.T. displays narcissism and has an inflated sense of self. This is a hindrance to her ability to change.

{¶ 76} When Dr. Cassel evaluated T.T. in 2017, she opined that there was enough time for T.T. to be rehabilitated in the juvenile setting and that the level of security in a juvenile facility would provide reasonable assurance of public safety. Dr. Cassel now questions whether that remains true. While T.T. has made significant educational gains, she "continues to test the limits, threatens people, gets in altercations, [and] continues to interfere with the whole process rather than learn from it." T.T. lashes out at anybody that restrains her and behaves as though rules and regulations do not apply to her. Dr. Cassel believes that it is "unlikely that [T.T.] is going to make significant changes to

22.

continue to be treated within the juvenile justice system." She expressed that T.T.'s prior behavior is the best indicator of how she is going to behave in the future, and she concluded that it is more likely than not that T.T. will not be rehabilitated within the juvenile system.

{¶ 77} On cross-examination, Dr. Cassel conceded that it is possible that T.T. may change. She clarified that narcissism is a personality disorder and a personality characteristic she observed in T.T., but was not her diagnosis. She reiterated that she was unable to assign the diagnosis of antisocial personality disorder because T.T. is not yet 18. She agreed that teenagers are immature and impulsive.

{¶ 78} Dr. Cassel watched the video of T.T. assaulting G.W. with her crutch and saw other information documenting incidents of threats. Dr. Cassel acknowledged that T.T. is on certain medications and her behavior may be impacted if she does not take her prescribed medications.

{¶ 79} As to T.T.'s family background, T.T. was raised by a single mother who worked a lot and her grandmother often babysat. Her father, an alcoholic, was in and out of her life and was not a positive role model. T.T. had a close but challenging relationship with her older brother that involved conflict and violence. Dr. Cassel agreed that T.T.'s chaotic home life impacted her behavior, but she believed that with structure, T.T.'s behavior might improve. It did not. T.T. continues to question rules and push limits like she did before entering the institution. The video of the assault at CAS demonstrates T.T.'s impulsivity. She has a pattern of fighting violence with violence.

23.

{¶ 80} Dr. Cassel spoke only briefly with T.T. about her sexuality because she did not believe that it was an important aspect of whether she would be rehabilitated. T.T. is a lesbian and seems comfortable with that fact.

{¶ 81} Dr. Cassel acknowledged that T.T. is not even half way through her juvenile detention—she still has three-and-one-half years left. While she has concluded that T.T. is unlikely to make significant changes in that time, she conceded that it is possible.

## I. Dr. Mark Babula

{¶ 82} Dr. Babula evaluated T.T. concerning whether there is sufficient time for T.T. to be rehabilitated in the juvenile system. He concluded that "the time remaining is sufficient if there are certain factors that are met."

{¶ 83} Dr. Babula spoke with T.T. about her family, educational, and medical history. There is closeness, but also conflict, within her family history. T.T. was raised by a working, single mother who struggled financially. At times, the utilities would be turned off and they would have to sleep in the car. She had limited supervision, was on the street a lot, and was often with her grandmother when she was available.

{¶ 84} T.T. and her mother have a caring and close relationship. She wanted to be around her mother growing up. She felt that she received less attention at around age nine when her mother became involved in a romantic relationship. She became less supervised. She would often leave and not tell her mother. T.T.'s father abused alcohol

24.

and her relationship with him was inconsistent. He sometimes lived with a girlfriend who would kick him out—along with the children. She was close to her brother.

{¶ 85} Corporal punishment was used in T.T.'s family. She witnessed her uncle being shot, in addition to other violence. This exposure to violence can lead to fear and can cause physical reactions that are manifested when a person feels threatened—a fight or flight reaction. This reaction increases adrenalin and the person becomes focused on survival. The failure to take care of T.T.'s basic needs was a perceived or actual threat to her survival that would trigger a response in her and lead her to feel that she needed to take care of her needs on her own, causing her to view the world as hostile.

{¶ 86} T.T. described a tendency to associate with males and reported that this subjected her to bullying and accusations of sexual promiscuity. She perceived the bullying as threatening and it triggered a fight or flight reaction in her—more likely a fight response. It is possible that the assault of the CAS employee triggered a fight or flight response. T.T. reported to Dr. Babula that she was triggered physically and emotionally and she reacted.

{¶ 87} Dr. Babula performed a number of tests, inventories, and assessments of T.T. T.T. did not have major clinical issues like psychosis, and there did not appear to be a major depressive disorder. But she seemed to have anxiety and some depression. He diagnosed her with adjustment disorder.

{¶ 88} The results of the assessments and questionnaires suggest that T.T. attempts to problem solve while under stress and her history of traumatic experiences

25.

leads her to maladaptive behaviors to manage anxiety. She tries to correct it, but may not make the best decisions. She does not trust people easily, has problems with authority, and is highly suspicious of others. T.T. thinks highly of herself, but at the same time, she may have some feelings of inadequacy and may have internalized a sense that she is bad or that others view her as bad. The tests showed a vulnerability to low self-esteem.

{¶ 89} The tests also indicate that T.T. may have sleep problems, but may be high energy. Borderline personality traits were elevated, as were antisocial behavior and physical aggression. T.T. can act impulsively and exercise poor judgment. She seems to see the complexity in the world and does not view things as only black or white. She may view others—parents and other authorities—as unsupportive. She is likely to see the world as hostile and has difficulty trusting others.

{¶ 90} T.T. wants to be independent and has a strong sense of fairness, but the tests show an elevation in self-centeredness and insistence on getting her way; if things don't go her way, she becomes agitated. When she feels disrespected, she may respond with violence and may gravitate to weapons as a way to feel safe. She can demonstrate disregard for others. She may have physical manifestations of stress, such as stomach issues.

{¶ 91} Dr. Babula believes that T.T. is aware that she needs help. He feels that she needs structure, guidance, direction, and a desire to succeed in order to make the right decisions. In terms of treatment, T.T. may need to learn appropriate assertiveness and to recognize the source of her thoughts and feelings. T.T's risk of reoffending is average.

26.

{¶ 92} In intelligence testing, T.T.'s crystallized intelligence was average. Processing and problem-solving were slightly below average. But she is not low intelligence; she does not have major intellectual deficits. T.T. skipped school frequently before being confined with DYS, so her schooling in DYS may have strengthened her intelligence. This probably would not have affected her decision making.

{¶ 93} T.T. takes Adderall for ADHD, trazodone and melatonin for sleep, and has an IUD. Dr. Babula does not know if there is a problem with her taking her medications, but if she does not take them, it could lead to her being more impulsive and more anxious. ADHD medications may manage T.T.'s impulsivity. People can be taught to control impulsivity—how to calm down, pause, and make a choice. Also, as a teen, T.T.'s frontal cortex is still developing. Age, good treatment, and reduced threats may improve a person's ability to remain calm and decrease impulsivity. Violence also tends to decrease with age.

{¶ 94} Dr. Babula believes that T.T. can be helped in the juvenile system and three years is not too short a time to fix these things. T.T. would need support and structure to work on her impulsivity and reactivity. She needs an environment with role models and people who are similarly working toward success. She should not be around people who consistently test her limits because that's when she tends to react impulsively. She also needs support in terms of education, job training, and skills. T.T. expressed that she understands that she needs to accept help in the system instead of fighting it.

27.

{¶ 95} Dr. Babula agrees that past behavior is the best predictor of future behavior, but he believes other factors must also be considered. He believes that resources and structure available must also be considered. Also, past behaviors could have been influenced by external factors such as drug use. The evaluations suggest that T.T. tends to work by external motivation. She needs to know that she can either get something or lose something based on her behavior.

{¶ 96} On cross-examination, Dr. Babula acknowledged that T.T. has been in a secure facility since December of 2016, but said that he would not necessarily expect T.T. to have ceased her fight or flight reaction during that time because that response is still being triggered by other people. He agreed that some people that are exposed to violence in their youth may become violent.

{¶ 97} T.T. reported to Dr. Babula that she had been bullied in the facility. Dr. Babula did not believe that T.T. had, in fact, been the bully. After reviewing various incident reports showing that T.T. had assaulted others, threatened staff members, and exhibited demeaning and disrespectful behavior toward staff, he conceded that T.T. displayed bullying or aggressive behavior in those instances, but said he would want to know more about each incident. He agreed that to the extent T.T. told him that the crutch incident was her only incident of physical aggression, this was untrue. He also agreed that her behavior was disruptive to DYS programming.

28.

{¶ 98} While Dr. Babula was aware that T.T. was meeting with a therapist weekly, he was not specifically aware of all the programming that had been made available to T.T. T.T. self-reported that before the crutch incident, she had not spoken to her mother or therapist in weeks. He had no reason to dispute information provided by the state indicating that she had actually spoken to her mother for five hours that day. He agreed that when self-reporting, T.T. had sometimes "sugarcoated" things.

{¶ 99} Dr. Babula conceded that the incident reports the state showed him demonstrate more violent acts than what T.T. reported to him and he agreed that "T.T. has not shown consistent change at DYS" and has not behaved consistently. He believes that the external influences at CAS are affecting the choices she is making, but he agreed that there is never going to be a way for everything to be perfect for T.T., whether she is at the institution or at home.

{¶ 100} Dr. Babula believes that T.T. has shown periods of change along with periods of regressing. He believes that it is likely she will have more periods of positive behavior. Exposure to positive social supports, minimizing aggravating factors, structure, guidance, mental health treatment, and job training will assist in improving her sense of identity and her behavior. Dr. Babula agrees with Dr. Cassel that T.T. demonstrates some characteristics of antisocial personality disorder, but he would have to look at the exact criteria to determine whether she meets the full diagnosis.

29.

## J. The Trial Court Judgment

{¶ 101} Following the hearing, the trial court granted the state's motion, terminated the juvenile portion of T.T.'s sentence, invoked the adult portion of her sentence, and transferred T.T. to the Ohio Department of Rehabilitation and Correction. T.T. appealed. She assigns the following errors for our review.

> Assignment of Error I:
>
> The juvenile court erred when it found that T.T. met the statutory requirements for invocation by being "admitted to a department of youth services facility" when she was placed at the Center for Adolescent Services, a community corrections facility. R.C. 2152.14(E).
>
> Assignment of Error II:
>
> The lower court erred when it determined that T.T. engaged in conduct that created a substantial risk to the safety or security of the institution, community, or victim and that T.T. could not be rehabilitated by her 21st birthday in the absence of clear and convincing evidence. Fifth and Fourteenth Amendments to the U.S. Constitution; Article 1, Section 16, Ohio Constitution; and R.C. 2152.14(E).
>
> Assignment of Error III:
>
> T.T. was denied effective assistance of counsel, in violation of the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution; and Article I, Sections 10, and 16, Ohio Constitution.

30.

## II. Law and Analysis

{¶ 102} Under R.C. 2152.14(E)(1), "[t]he juvenile court may invoke the adult portion of a person's serious youthful offender dispositional sentence if the juvenile court finds all of the following on the record by clear and convincing evidence":

(a) The person is serving the juvenile portion of a serious youthful offender dispositional sentence.

(b) The person is at least fourteen years of age and has been admitted to a department of youth services facility, or criminal charges are pending against the person.

(c) The person engaged in the conduct or acts charged under division (A), (B), or (C) of this section, and the person's conduct demonstrates that the person is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction.

{¶ 103} In her first assignment of error, T.T. argues that the state failed to show that she was "admitted to a department of youth services facility," as required under R.C. 2152.14(E)(1)(b). In her second assignment of error, T.T. argues that the state failed to prove that she engaged in conduct described in R.C. 2152.14(E)(1)(c), and that she is unlikely to be rehabilitated by her 21st birthday. And in her third assignment of error, T.T. argues that trial counsel was ineffective for failing to describe DYS's duties to rehabilitate T.T. and for failing to inquire into whether DYS exhausted all of its options before requesting invocation.

31.

## A. "Admitted to a Department of Youth Services Facility"

{¶ 104} In her first assignment of error, T.T. argues that the trial court erred when it found that T.T. had been admitted to a "department of youth services facility." T.T. maintains that she was placed at CAS in Montgomery County, which she insists is a "community corrections facility" that is a less secure, community placement—not a DYS facility. She maintains that while DYS may have a relationship with CAS whereby CAS "is authorized to place females committed to DYS," it is not a DYS facility, therefore, she was not statutorily eligible to have her SYO invoked.

{¶ 105} The state responds that for purposes of R.C. 2152.14(E), CAS is a DYS facility. It explains that DYS contracts with CAS to provide a facility for female youths committed to DYS, DYS placements at CAS are under DYS supervision, placement at CAS is not "in lieu of" commitment to DYS, CAS is a "secure facility" under contract with DYS, and CAS is not a "community corrections facility" for female youths in DYS custody.

{¶ 106} Under R.C. 2152.02(B), "[a]dmitted to a department of youth services facility" is a defined term that means "admission to a facility operated, *or contracted for*, by the department * * *." (Emphasis added.) "Facility" is not defined, but R.C. 5139.36(E)(2) provides that "[a] child in the custody of the department of youth services may be placed in a community corrections facility in accordance with either division (E)(2)(a) or (b) of this section." A "community corrections facility" is "a county or multicounty rehabilitation center for felony delinquents who have been committed to the

32.

department of youth services and diverted from care and custody in an institution and placed in the rehabilitation center pursuant to division (E) of section 5139.36 of the Revised Code." R.C. 5139.01(14).

{¶ 107} CAS is a community correction facility. But R.C. 5139.36(E)(2)(b) authorizes DYS "with the consent of the juvenile court with jurisdiction over the Montgomery county [CAS]," to "establish a single unit within the community corrections facility for female felony delinquents committed to the department's custody." DYS "may place a female felony delinquent committed to [its] custody into the unit in the community corrections facility." R.C. 5139.36(E)(2)(b). Although placed in the community corrections facility, the child "remain[s] in the legal custody of the department of youth services * * *." R.C. 5139.36(E)(2).

{¶ 108} Here, the state presented evidence that DYS has been placing female delinquent youths at CAS since 2013. CAS maintains a 15-bed unit specifically established for female felony delinquents placed there by DYS. T.T. occupies one of those 15 beds. Her treatment is overseen by the female program administrator for DYS and DYS controls her placement. We, therefore, find no error in the trial court's conclusion that T.T. had been admitted to a "department of youth services facility."

{¶ 109} We find T.T.'s first assignment of error not well-taken.

## B. Substantial Risk and Rehabilitation

{¶ 110} In her second assignment of error, T.T. argues that the state did not prove by clear and convincing evidence that T.T.'s behavior created a substantial risk to CAS,

33.

the victim, or her community. She maintains that the evidence showed that she had some "difficult days" at CAS, but she insists that none of the government's witnesses believed that her behavior was negative all the time or that they were fearful of her. Rather, she had periods of good behavior, most of her infractions were low-level, DYS was open to allowing T.T. to transfer to a step down facility, and her behavior will improve with time and proper treatment.

{¶ 111} T.T. also contends that the state did not prove by clear and convincing evidence that she is unlikely to be rehabilitated by her 21st birthday. She points out that youth in other jurisdictions—particularly male youths—receive multiple chances at different facilities to improve their behavior before invoking their adult sentence, DYS and CAS did not provide the appropriate treatment to rehabilitate her by her 21st birthday, and multiple witnesses testified that with appropriate treatment from DYS, T.T. could be rehabilitated by her 21st birthday.

{¶ 112} The state responds that the record contains clear and convincing evidence supporting the conclusion that T.T. created a substantial risk to CAS and the community. Specifically, it contends that (1) T.T. assaulted G.W. with a wooden crutch, which, at a minimum, is a first-degree misdemeanor; (2) T.T. struck Wood during a routine patdown; (3) T.T. used her fist to strike another youth at CAS and engaged in other fights with her peers; (4) T.T. threatened other CAS staff; (5) Wood, Shaffer, and Mitchell testified that T.T.'s behavior had a negative effect on staff and other youths at CAS, undermined the security of the institution, and affected programming; (6) T.T.'s periods of good behavior

34.

were calculated not to achieve change, but rather to get what she wanted; (7) thirty percent of T.T.'s infractions were for aggressive behaviors; and (8) even when she was not directly involved in misconduct, T.T. was often perceived as "pulling the strings" when others committed infractions.

{¶ 113} The state also insists that the record contains clear and convincing evidence supporting the conclusion that T.T. will not be rehabilitated in the juvenile system. Specifically, it contends that T.T. (1) minimized or refused to accept responsibility for her actions; (2) failed to follow institutional rules and participate in programming; and (3) showed little improvement despite two years in the juvenile system.

{¶ 114} The state emphasizes that Dr. Cassel evaluated T.T. both before and after her stay at CAS, and despite her initial recommendation that T.T. could be rehabilitated in the juvenile justice system, she changed her opinion based on T.T.'s behavior at CAS, the results of psychological testing, and T.T.'s problematic tendency not to accept responsibility for her actions. To the extent that Dr. Babula offers a contrary opinion, the state contends that that opinion is premised on a lack of knowledge of the resources made available to T.T. and inaccurate self-reporting by T.T. It maintains that T.T. was given ample program opportunities, therapeutic treatment, access to appropriate medication, and opportunities for structured therapy, but T.T. failed to respond to any of these approaches.

35.

{¶ 115} In order to invoke the adult portion of a person's SYO dispositional sentence, the juvenile court was required to find by clear and convincing evidence that T.T. committed an act that is a violation of the rules of the institution and that could be charged as any felony or as a first degree misdemeanor offense of violence if committed by an adult, *or* engaged in conduct that creates a substantial risk to the safety or security of the institution, the community, or the victim, *and* that her conduct demonstrates that she is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. R.C. 2152.14(E).

{¶ 116} "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and *unequivocal*." (Emphasis in original.) *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.*

{¶ 117} We review a trial court's decision to impose the adult portion of a SYO sentence under an abuse-of-discretion standard. *In re M.M.,* 3d Dist. Allen No. 1-17-56, 2018-Ohio-1110, ¶ 11. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217,

36.

219, 450 N.E.2d 1140 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 10th Dist. Franklin No. 17AP-742, 2019-Ohio-223, ¶ 13. "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.* quoting *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 10th Dist. Franklin No. 08AP-69, 2008-Ohio-3567, ¶ 11. And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.*

{¶ 118} Here, the state presented evidence that T.T. committed an act that is a violation of the rules of the institution and that could be charged as a felony or as a first degree misdemeanor offense of violence if committed by an adult. Specifically, it presented evidence that T.T. assaulted G.W. with a wooden crutch, striking her with it until it broke. Indeed, this conduct was captured on video. While we are unaware of the outcome, T.T. was, in fact, charged with assault in connection with the incident. *In re T.T.*, 2d Dist. Montgomery No. 28326, 2019-Ohio-3002, ¶ 2. Additionally, the state presented evidence that just a month before the hearing on the state's motion to invoke her adult sentence, T.T. struck Wood during a routine patdown.

{¶ 119} The state also presented evidence that T.T. engaged in conduct that creates a substantial risk to the safety or security of the institution. Shaffer testified that T.T. committed 161 infractions of CAS rules, 53 of which were considered higher-level rule violations. Shaffer testified unequivocally that T.T.'s conduct—which includes other acts of physical aggression and threats against peers and staff members—presents a

37.

safety risk to the institution. T.T. engaged in this behavior despite repeated admonitions from CAS and DYS staff that she risked having her adult sentence invoked.

{¶ 120} We conclude that there is sufficient evidence to support the trial court's conclusion that there is clear and convincing evidence that T.T. committed an act that is a violation of the rules of the institution and that could be charged as any felony or as a first degree misdemeanor offense of violence if committed by an adult, and engaged in conduct that creates a substantial risk to the safety or security of the institution.

{¶ 121} As for whether T.T.'s conduct demonstrates that she is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction, the evidence presented at the hearing demonstrates that T.T. has made progress academically. But it also demonstrates that T.T. has refused to engage in CBT, she has committed repeated rule infractions, her behavior has regressed, and she has not exhibited a desire to change.

{¶ 122} While T.T. was described as "smart" and "talented," witnesses testified that she has used those attributes to manipulate her peers rather than to make necessary changes. Periods of good behavior seem to be motivated by a desire to "size up her next opportunity" rather than for the purpose of making change. Many of the professionals who have worked with T.T. expressed that she is *able* to change, as evidenced by her ability to sometimes follow the rules, but she has repeatedly chosen not to change.

{¶ 123} Mitchell, who has worked with youth for 37 years, said that T.T. is not progressing. Jefferson described that T.T. did well initially, but her behavior has regressed. Shaffer, who has more than 20 years' experience in the juvenile justice system

38.

and has seen successful youth at the facility, said that he does not expect to see long-term improvement from T.T. And both Shaffer and Mitchell expressed that T.T.'s behavior toward her primary therapist has been oppositional and aggressive and other witnesses described that she remains defiant and argumentative with staff.

{¶ 124} In addition to the professionals from DYS and CAS who work with T.T., Dr. Cassel concluded that it is unlikely that T.T. will be successfully rehabilitated in the juvenile system. T.T.'s past behavior—which Dr. Cassel feels is most predictive of what to expect of her future behavior—suggests that significant change in T.T.'s behavior is unlikely because despite almost two years at CAS, she continues to test the limits, threaten people, get involved in confrontations, interfere with the process instead of learn from it, and refuse to accept responsibility for her own actions.

{¶ 125} To the extent that Dr. Babula testified that it is possible for T.T. to be rehabilitated in the time left before she turns 21, Dr. Babula acknowledged that he was not aware of the therapies and treatments already made available to T.T., his opinions were premised, in part, on inaccurate information self-reported to him by T.T., and he conditioned his opinions on the ability to shelter T.T. from "aggravating factors" in her environment that cannot feasibly be eliminated.

{¶ 126} We conclude that there is sufficient evidence to support the trial court's conclusion that there is clear and convincing evidence that T.T. is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. The trial court did not

39.

abuse its discretion in granting the state's motion to invoke the adult portion of T.T.'s sentence.

{¶ 127} We find T.T.'s second assignment of error not well-taken.

## C. Ineffective Assistance of Counsel

{¶ 128} In her third assignment of error, T.T. argues that she received ineffective assistance of trial counsel. Specifically, she maintains that trial counsel failed to (1) describe the statutory duties that DYS owed under R.C. 5139.04(B) to rehabilitate her, and (2) inquire into whether DYS had exhausted all of its options before it requested invocation. T.T. contends that these deficiencies prejudiced her because it deprived the juvenile court of "vital context regarding the invocation of SYOs and crucial evidence regarding T.T.'s likelihood of rehabilitation in the juvenile system."

{¶ 129} The state responds that R.C. 5139.04(B) requires DYS to "[r]eceive custody of all children committed to it under Chapter 2152. of the Revised Code, cause a study to be made of those children, and issue any orders, as it considers best suited to the needs of any of those children and the interest of the public, for the treatment of each of those children[.]" It argues that R.C. 5139.04(B) does not "absolve the juvenile from a concomitant responsibility to assist in rehabilitation efforts, to participate in programming, to cooperate with staff, and to refrain from committing acts of violence or issuing threats of violence." It insists that reminding the court of the statutory duties set forth in R.C. 5139.04(B) would have had no effect on the outcome of the case.

40.

{¶ 130} With respect to T.T.'s claim that her counsel failed to inquire into whether DYS had exhausted all options, the state argues that the witnesses testified that T.T. did not perform well at CAS and was unsuccessful at Pomegranate. It maintains that the programming was explained in detail, as were T.T.'s therapist's efforts and T.T.'s response to those efforts. Additionally, numerous staff members testified that they saw no improvement from T.T., and the program director was convinced that any perception of improvement would be misleading because it would have been engineered by T.T. to give the appearance of rehabilitation despite the absence of truly-internalized change. The state insists that asking about other available options would not have changed the outcome of the proceeding.

{¶ 131} In reply, T.T. contends that the state's argument does not consider the trauma T.T. suffered and the fact that DYS did not treat her for this trauma, instead focusing on correcting her behavior without treating the underlying causes of it. She believes that if trial counsel would have pointed out that DYS was responsible for providing treatment best suited to rehabilitate T.T. and done further investigation into whether all treatment options had been exhausted, the court could have considered other placement and treatment options for T.T. instead of invoking her adult sentence.

{¶ 132} In order to prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *State v. Shuttlesworth*, 104 Ohio App.3d 281, 287, 661 N.E.2d 817 (7th

41.

Dist.1995). To establish ineffective assistance of counsel, an appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204, citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002).

{¶ 133} First, this court observes that the juvenile judge here is an experienced jurist who is no doubt aware of DYS's responsibilities to T.T. We also observe that it was clear from Shaffer and Weir's testimony that—in addition to a wide variety of programming—treating T.T.'s trauma was a central focus of their rehabilitative efforts; T.T. refused to participate in that therapy. Weir explained that T.T. needs therapy for her trauma, but she emphasized that T.T. had to be open to it—and she was not. In fact, instead of opening herself to this therapy, T.T. exhibited oppositional and aggressive behavior toward her therapist.

{¶ 134} The resounding theme from the professionals who worked with T.T. is that she chose to reject the assistance made available to treat her trauma and effect change in her behavior. We find that the outcome of the proceedings would not have been altered had trial counsel pointed out to the juvenile judge DYS's responsibilities to rehabilitate T.T. or inquired about what more DYS could have done to rehabilitate T.T.

42.

{¶ 135} We find T.T.'s third assignment of error not well-taken.

### III. Conclusion

{¶ 136} We conclude that T.T. was "admitted to a department of youth services facility." R.C. 5139.36(E)(2)(b) authorized CAS to "establish a single unit" within the facility for "female felony delinquents committed to the department's custody" and it authorized DYS to "place a female felony delinquent committed to [its] custody" into that unit. "[A]dmitted to a department of youth services facility," includes admission to a facility "contracted for" by DYS. We find T.T.'s first assignment of error not well-taken.

{¶ 137} We conclude that there is sufficient evidence to support the trial court's conclusions that (1) there is clear and convincing evidence that T.T. committed an act that is a violation of the rules of the institution and that could be charged as any felony or as a first degree misdemeanor offense of violence if committed by an adult, or engaged in conduct that creates a substantial risk to the safety or security of the institution; and (2) there is clear and convincing evidence that T.T. is unlikely to be rehabilitated during the remaining period of juvenile jurisdiction. We find T.T.'s second assignment of error not well-taken.

{¶ 138} We conclude that trial counsel was not ineffective for failing to point out to the juvenile judge DYS's responsibilities under R.C. 5139.04(B) to rehabilitate T.T. or inquire about what more DYS could have done to rehabilitate T.T. We find T.T.'s third assignment of error not well-taken.

43.

**{¶ 139}** We affirm the October 31, 2019 judgment of the Lucas County Court of Common Pleas, Juvenile Division.  T.T. is ordered to pay the costs of this appeal under App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.         

_____

JUDGE

Christine E. Mayle, J.         

_____

JUDGE

Gene A. Zmuda, P.J.         
CONCUR.

_____

JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.